# JANUARY 10, 1934

EX PARTE EDWIN BRINKER.

No. 16589.  Delivered January 10, 1934.
Reported in 67 S. W. (2d) 318.

The opinion states the case.

*Vinson, Elkins, Sweeton & Weems,* of Houston, *J. K. Brim,* of Sulphur Springs, and *King, Mahaffey, Wheeler & Bryson,* of Texarkana, for appellant.

*Lloyd W. Davidson,* State's Attorney, of Austin, for the State.

MORROW, PRESIDING JUDGE.—The appeal is from an order of the District Court of Bowie County refusing to admit the relator to bail.

Edwin Brinker is under indictment for the murder of P. A. McSwain.  It appears that the dead body of McSwain was discovered in the closet or pantry in the house in which he was an inmate.  His body was wrapped in a sheet upon which there were powder burns and blood, also a hole indicating that McSwain had been shot while wrapped in the sheet.  It was shown that upon his body was a gunshot wound sufficient to cause instant death.

In the brief of the State's Attorney before the Court of Criminal Appeals is a statement expressing the opinion that upon the record before the court the accused is entitled to bail upon sufficient security.

In Bill of Exception No. 2, prepared by the relator, is em-

braced the statement of facts, which is approved as correct by the trial judge and from which we take the following quotation:

"That the defendant EDWIN BRINKER was taken into custody by the Texas Rangers in the County Building in the City of Texarkana, Texas, a little before noon on the 17th of November, 1933; that the said Texas Rangers, during the noon hour placed the said defendant in the custody of officer Ralph Merchant, with instructions not to permit the said defendant to talk to any person about the case, which instruction Merchant testified he understood to include the defendant's father and lawyer who had accompanied him to Texarkana, and which instructions the said Merchant obeyed; that immediately after the noon hour, the said Rangers, together with officer Albert Chilcote, started questioning the defendant relative to the murder of McSwain, which was alleged to have occurred in Bowie County, Texas, on or about the 28th day of June, 1933, and that the said three officers continued to question this defendant either separately or together, during all of the afternoon of November 17th, and that during all of said time the defendant constantly denied any connection with, or guilt of the murder of McSwain; that the said Texas Rangers, immediately after they had had their evening meal, summoned to their assistance for the purpose of further questioning the said defendant, EDWIN BRINKER, several other City and County officers, and that there was present and acting in conjunction with said Texas Rangers, and particiuating in the questioning of this defendant, at least at intervals during the night of November 17th and early morning of November 18th, the following named City and County officers, to-wit: Harry Monsarrat, L. P. McDonald, Albert Chilcote, C. A. Lee, H. S. Meadows, Ralph Merchant, Red Herrington and in addition to said officers, the District Attorney, Elmer L. Lincoln, who in turn called to their assistance in the questioning of the defendant, the wife of the deceased, Mrs. P. A. McSwain, who had come from Birmingham, Alabama, for the purpose of helping solve the murder of her husband; that F. C. McCauley, the brother of Mrs. P. A. McSwain, was also present during the said night of November 17th and early morning of November 18th, as was a man by the name of Townsend, and another man by the name of Ramsey, who were being held by the State under suspicion of having murdered McSwain, who, nevertheless, were permitted to also question the defendant relative to certain statements made by him relative to such murder.

"That the defendant was constantly questioned without any

appreciable interruption by some one or more of the above named officers and persons, from about noon of November 17th, to between 5:00 and 6:30 o'clock of the morning of November 18th, a period of over seventeen hours, and that such questions related to his statements regarding, and his alleged connection with the murder of P. A. McSwain; that while he was being questioned, the witness F. C. McCauley testified that one or more of the officers whom he heard questioning the defendant, asked the defendant 'what he killed Mac for'; that he heard them ask that question several times, but not in succession. That such questioning continued until past midnight, when certain of the said officers who had been present during the said period wrapped 'Red' Herrington, a deputy sheriff, in a sheet on which had been poured some 'mercurochrome' so as to make the sheet appear as though blood-soaked; and that before the defendant was carried into the room where Herrington (representing the dead man) was, that an explosion was heard, which according to the testimony of more than one witness, sounded like a gun shot; and according to the testimony of at least one witness testifying relative to the death scene and the circumstances surrounding it, that it 'seems to me the light was turned off for a moment, but I am not positive about that, but it seems to me it was; but when he came into the room the light was on. I am sure of it because I was in there'; and the defendant was brought into the presence of Herrington, the supposed dead man, and was, according to the District Attorney's testimony, told by the Rangers of some of the officers present that—'There lies the body representing McSwain. Now you look at that body and tell us how that body was wrapped up, look at the head and see'; and officer McDonald testified that while his purpose in questioning him was to get him to tell what his connection with the crime was, and that he thought that the defendant did it, that he used all his persuasive powers at that time but did not succeed in getting the defendant to admit he killed McSwain; that at one time while officer Chilcote and two Rangers were questioning the defendant, that the defendant jumped up and wanted to jump on the three of them, but that they pushed him back in his chair; that at intervals while he was being questioned and when he refused to answer the questions of the officer who was asking the question, that they would take hold of his chin and lift up his head and make him look at them and answer their questions; that as soon as the defendant made a statement that he killed McSwain, that no other questions were asked by the officers relative to McSwain's murder."

The confession made by the relator at the close of the inquisition mentioned was in form in accord with the confession statute, article 727, C. C. P., signed by the relator, and contained the statement admitting that he had killed McSwain under circumstances which would amount to murder. There was also introduced in evidence a statement previously made by the relator in response to interrogation by officers which had been reduced to writing, verified by his oath, and giving a detailed account of his acts and whereabouts, which statement, if true, would exculpate the relator and show that he had not participated in any manner in the homicide under consideration. Aside from the written confession introduced by the state, which conflicts with the statement above mentioned, there appears no evidence in the record adequate to deny or authorize the denial of bail to the relator pending the trial, in view of the constitutional provision declaring that "all prisoners shall be bailable by sufficient sureties, unless for capital offenses, when the proof is evident." See Bill of Rights, art. 1, sec. 11; C. C. P., art. 5.

In his brief and argument the relator contends that this court on this appeal should determine whether the written confession, which was introduced in evidence, was admissible. The contention is based in part upon the claim that the conduct of the officers, as shown by the record, amounted to torture and in that particular was violative of article 1157, P. C., in which it is declared that if any officer having "under arrest or in his custody any person as a prisoner who shall torture, torment or punish such person by inflicting upon him any physical or mental pain for the purpose of making or attempting to make such person confess to any knowledge of the commission of any offense against the laws of this state," shall be fined or imprisoned as provided in the statute.

It is also contended that by reason of article 1157, supra, the alleged confession obtained from the relator in the methods described by the statement of facts, was violative of the law, and was rendered inadmissible by article 727a, C. C. P., which declares that no evidence obtained by an officer or other person in violation of any provision of the Constitution or laws of the State of Texas, shall be admitted in evidence against the accused on the trial of any criminal case.

It is further contended that the facts leading up to the confession, by the means of which it was obtained, was violative of article 1169, P. C., and that by reason thereof the confession in question was rendered inadmissible in evidence. In that con-

nection relator refers to article 1174, P. C., touching the penalty for false imprisonment.

Touching the merits of the attack upon the confession based upon the several statutes, namely, articles 1157, 1169, and 1174, P. C., and article 727a, C. C. P., this court expresses no opinion. The conflicting evidence disclosed in the two written statements, precludes, it is thought, the authority to refuse relator bail.

Whether the claimed confession will be available to the state upon the final trial must be determined by the evidence adduced at that trial. Touching the procedure to be followed, attention is drawn to the case of Bingham v. State, 97 Texas Crim. Rep., 594, in which there was dealt with a matter analogous to that of the admissibility of the confession. It is thought that the precedents there cited will be helpful. We also refer to Tex. Jur., vol. 18, p. 188, sec. 103; Williams v. State, 58 S. W. (2d) 125; Hernandez v. State, 110 Texas Crim. Rep., 159, 8 S. W. (2d) 947; Williams v. State, 88 Texas Crim. Rep., 87.

The relator will be discharged upon the execution of bail with sufficient sureties in the sum of $5,000.00.

*Relator's bond fixed at $5,000.*